1
2
3
4
5
6
7            UNITED STATES DISTRICT COURT
8            CENTRAL DISTRICT OF CALIFORNIA
9
10   SAMUEL VANEK,                          Case No. CV 14-4427-AG (KK)
11                        Petitioner,
12              v.                          FINAL REPORT AND
                                            RECOMMENDATION OF UNITED
13   C. WOFFORD, Warden,                    STATES MAGISTRATE JUDGE
14                        Respondent.
15
16
17        This Final Report and Recommendation is submitted to the Honorable
18   Andrew J. Guilford, United States District Judge, pursuant to Title 28 of the
19   United States Code, section 636 and General Order 05-07 of the United States
20   District Court for the Central District of California.

## I.

## **INTRODUCTION**

23        Samuel Vanek ("Petitioner"), a California state prisoner, has filed a First
24   Amended Petition for Writ of Habeas Corpus ("Petition") pursuant to Title 28 of
25   the United States Code, section 2254(d), challenging his 2010 conviction for willful
26   child abuse with an enhancement for great bodily injury, after a two-day bench trial
27   in Los Angeles County Superior Court.
28   ///

Petitioner's conviction was largely based on the uncontested testimony of the prosecution's expert witness on "Shaken Baby Syndrome."  However, by 1998, over a decade before Petitioner's trial, the scientific community had recognized a vigorous debate about the validity of a Shaken Baby Syndrome diagnosis that, as in Petitioner's case, was based solely on a particular triad of symptoms – (1) subdural hemorrhage, (2) cerebral edema, and (3) retinal hemorrhage.  See, e.g., Cavazos v. Smith, ___ U.S. ___, 132 S. Ct. 2, 10, 181 L. Ed. 2d 311 (2011) (J. Ginsberg dissent) (citing Donohoe, Evidence–Based Medicine and Shaken Baby Syndrome, Part I: Literature Review, 1966–1998, 24 Am. J. Forensic Med. & Pathology 239, 241 (2003) (By the end of 1998, it had become apparent that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS," and that "the commonly held opinion that the finding of [subdural hemorrhage] and [retinal hemorrhage] in an infant was strong evidence of SBS was unsustainable.")).  In a recent decision, the Ninth Circuit cited a 2006 textbook calling the triad-only diagnosis into question and further noted the forensic science supporting a Shaken Baby Syndrome diagnosis is "presently in flux."  Gimenez v. Ochoa, No. 14-55681, 2016 WL 2620284, at *6 (9th Cir. May 9, 2016).  Yet another court recently noted "a claim of shaken baby syndrome is more an article of faith than a proposition of science."  Del Prete v. Thompson, 10 F. Supp. 3d 907, 957 n.10 (N.D. Ill. 2014).

Despite this questioning of Shaken Baby Syndrome at the time of Petitioner's trial, Petitioner's counsel failed to call at trial – or even consult with – an expert to counter the prosecution's expert.  Instead, because Petitioner's counsel concluded, without investigation, that Petitioner had admitted his guilt in out-of-court statements, counsel failed to present a viable defense and conceded Petitioner's guilt in closing arguments.

///

1   Petitioner's counsel's failure to investigate the state's medical case, consult

2   with a medical expert, or retain and present such an expert was deficient and

3   prejudicial under <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L.

4   Ed. 2d 674 (1984).  The state court's denial of Petitioner's claim of ineffective

5   assistance of counsel was objectively unreasonable.  Hence, for the reasons detailed

6   below, the Court recommends granting the Petition on the basis of Petitioner's

7   claim of ineffective assistance of trial counsel.  The Court recommends Petitioner's

8   remaining claims for false evidence, erroneous admission of evidence, and

9   cumulative error be denied.

## II.

## <u>CLAIMS FOR RELIEF</u>

12   Petitioner's four claims, as presented in his Petition, are as follows:

13   (1) <u>Claim One</u>: Petitioner's trial counsel was ineffective because she failed to

14   investigate the state's medical case, consult with a medical expert who could have

15   rebutted the state's medical evidence, or retain or present such a defense medical

16   expert at trial.

17   (2) <u>Claim Two</u>: Petitioner's conviction was obtained through the state's

18   presentation of false evidence, in violation of Petitioner's Fourteenth Amendment

19   due process rights.

20   (3) <u>Claim Three</u>: The trial court's admission of evidence of several incidents

21   involving Petitioner's alleged angry or violent behavior toward family members

22   violated Petitioner's due process right to a fair trial.

23   (4) <u>Claim Four</u>: The cumulative effect of trial counsel's ineffective failure to

24   investigate or rebut the state's medical case, the state's presentation of false

25   evidence, and the trial court's erroneous admission of dissimilar instances of

26   Petitioner's conduct for the impermissible purpose of showing his character,

27   rendered Petitioner's trial fundamentally unfair.

28   ///

1

2

### III.

### PROCEDURAL HISTORY

On June 1, 2010, following a two-day bench trial in Los Angeles County Superior Court, Petitioner was convicted of willful child abuse in violation of California Penal Code section 273a(a), with an enhancement for great bodily injury pursuant to California Penal Code section 12022.7(d). Lodgment No. ("lodg.") 1 at 91.[1]  On July 8, 2010, the trial court sentenced Petitioner to ten years in state prison.  Id. at 99-101.

Petitioner appealed the judgment of conviction on the grounds of erroneous admission of evidence of uncharged misconduct. Lodg. 3. On April 2, 2013, the California Court of Appeal affirmed Petitioner's convictions on direct appeal in a reasoned decision. Lodg. 6.

On May 14, 2013, Petitioner filed a petition for review in the California Supreme Court. Lodg. 7. On June 19, 2013, the California Supreme Court summarily denied review of the appeal. Lodg. 8.

On June 6, 2013, Petitioner filed a habeas corpus petition in the California Court of Appeal (B249178) raising the grounds of ineffective assistance of trial counsel. Lodg. 9. On July 2, 2013, the petition was summarily denied. Lodg. 10.

On August 28, 2013, Petitioner filed a habeas corpus petition in the Los Angeles County Superior Court (VA108590) raising the grounds of ineffective assistance of trial counsel. Lodg. 11. On October 3, 2013, the petition was denied.

---

[1]    The Court's citations to Lodgments refer to the documents lodged by Respondent in support of his Opposition to Petitioner's Motion for Leave to Amend Petition for Writ of Habeas Corpus, Opposition to Petitioner's Motion to Stay Proceedings, and Answer.  ECF Docket No. ("Dkt.") 25, 37, 57.  Lodgment 1 is a copy of the Clerk's Transcript ("CT") from Petitioner's trial court proceedings.  Lodgment 2 is a Supplemental Clerk's Transcript ("SCL") from Petitioner's trial court proceedings.  Lodgment 21 is a copy of the Reporter's Transcript ("RT") of Petitioner's trial court proceedings.  Lodgment 22 is a copy of the Augmented Reporter's Transcript ("ART") of Petitioner's trial court proceedings.

1    Lodg. 12.  The court stated: "the claim of ineffective assistance of trial counsel
2    either was or should have been raised on appeal."  Id.
3        On October 29, 2013, Petitioner filed a petition for writ of mandate in the
4    California Court of Appeal on the grounds the superior court abused its discretion
5    in denying review of Petitioner's claim for ineffective assistance of trial counsel.[2]
6    Lodg. 13.  On November 26, 2013, the petition was denied.  Lodg. 14.  The Court of
7    Appeal found "the petition filed in the trial court is substantial [sic] identical to the
8    petition for writ of habeas corpus (B249178) reviewed by this court."  Id.  The
9    court of appeal held it was not an abuse of discretion to deny the duplicative
10   petition.  Id.
11       On January 8, 2014, Petitioner filed a petition for a writ of habeas corpus in
12   the California Supreme Court (S215724) raising the grounds of ineffective
13   assistance of trial counsel.  Lodg. 15.  On April 9, 2014, the California Supreme
14   Court summarily denied the habeas corpus petition.  Lodg. 16.
15       On June 9, 2014, Petitioner filed a petition for writ of habeas corpus in this
16   Court setting forth the following two grounds for relief: (1) ineffective assistance of
17   trial counsel, and (2) erroneous admission of evidence of alleged unrelated
18   misconduct.  Dkt. 1 at 5.
19       On September 9, 2014, the Court appointed counsel for Petitioner.  Dkt. 13.
20   On November 3, 2014, Petitioner filed a Motion for Leave to Amend the petition
21   for writ of habeas corpus to include the following four grounds for relief: (1)
22   ineffective assistance of trial counsel; (2) erroneous presentation of false evidence;
23   (3) erroneous admission of evidence; and (4) the cumulative effect of the errors
24   rendered the trial fundamentally unfair.  Dkt. 21.  On January 28, 2015, the Court

25

26   ─────────────
27   [2]   Carr v. Los Angeles Superior Court, 77 F. App'x 952, 954 (9th Cir. 2003)
     ("'petition for writ of mandate' in the California Court of Appeal seeking relief
28   under what was then California Rule of Court 260(e) . . . cannot be characterized as
     [a] habeas petition[] because the only relief sought was an order directing the
     Superior Court to explain its decision").

1  issued an order granting Petitioner's Motion to file a First Amended Petition and

2  the First Amended Petition ("Petition") was deemed filed on November 3, 2014.

3  Dkt. 34.

4      On December 12, 2014, Petitioner filed a petition for habeas corpus with the

5  California Supreme Court raising all four grounds set forth in the Petition.  Lodg.

6  18 at 2.

7      On February 6, 2015, Petitioner filed a Motion to Stay the instant action

8  pending exhaustion of claims in state court.  Dkt. 35.  On March 5, 2015, this Court

9  granted Petitioner's Motion to Stay the action.  Dkt. 42.

10     On March 11, 2015, the California Supreme Court summarily denied the

11 petition with citation to In re Clark, 5 Cal.4th 750, 767-69 (1993).  Lodg. 20.

12     On March 26, 2015, Petitioner filed a Motion to Reopen the instant action.

13 Dkt. 43.  On April 1, 2015, the Court granted Petitioner's Motion to Reopen.  Dkt.

14 45.

15     On October 5, 2015, Respondent filed an Answer, contending Petitioner's

16 claims are meritless.  Dkt. 56.  On January 4, 2016, Petitioner filed a Traverse.  Dkt.

17 64.  On February 25, 2016, the Court requested supplemental briefing regarding

18 the Court's ability to consider the declaration of Petitioner's trial counsel, which

19 was submitted to the California Supreme Court for the first time with Petitioner's

20 December 12, 2014 state habeas petition.  Dkt. 67.  On April 18, 2016, Petitioner

21 and Respondent filed Supplemental Briefs.  Dkts. 74, 75.

22     On May 20, 2016, the Court issued its original Report and Recommendation

23 that the Petition be granted on the basis of Petitioner's claim of ineffective

24 assistance of trial counsel and denying Petitioner's remaining claims.  Dkt. 77.  On

25 June 20, 2016, Petitioner filed objections to the original Report and

26 Recommendation.  Dkt. 82, Pet. Objections.  On July 20, 2016, Respondent filed

27 objections to the original Report and Recommendation.  Dkt. 83, Resp. Objections.

28 Thus, the Court herein issues a Final Report and Recommendation, addressing

Petitioner's objection in footnote 11 and Respondent's objections in footnotes 8 and 10.

## IV.

## RELEVANT FACTS

**A.    EVIDENCE AT TRIAL**

      **1.    Prosecution Case**

           **a.    Timeline**

In April 2008, Petitioner and his girlfriend, Rebecca, had recently completed their military service and were living together at Fort Irwin with Rebecca's sons Juan, who was ten, and Devon, who was six.  RT 30, 43-44.  (Petitioner also had two sons from a prior marriage, but they did not live with Petitioner in 2008.  RT 44, 68.)  When Rebecca's sister, Cassandra, and her husband were deployed to Iraq in April 2008, they left their two-month-old son, Gabriel (aka "Madden"), in Rebecca's care.  RT 10-11.  Petitioner told Cassandra "he was excited and he was looking forward to this opportunity to be a caretaker for the child."  RT 24.

Rebecca testified she took primary care of Gabriel, Petitioner became easily annoyed when Gabriel cried, and Petitioner had asked her, "Why did you have to take the baby; I hate babies."  RT 36, 61-62.  Juan testified he heard Petitioner tell Rebecca: "I hate this damn baby. . . . Why did you even tell your sister that we could keep him here?"  RT 100.  However, Rebecca also testified she had no concerns about leaving Petitioner alone with her children or Gabriel.  RT 46, 55, 64-65.

Over the weekend of May 24 to 25, 2008, Petitioner, Rebecca, Juan, Devon, and Gabriel moved to La Mirada.  RT 27.  Gabriel was not feeling well, was fussy, and was not sleeping well.  RT 49.  Petitioner suggested Rebecca take Gabriel to the doctor, but Rebecca believed "he was just teething and . . . he wasn't sick enough, in her opinion, that he needed to go to the doctor."  RT 49-50, 316.

On the morning of May 26, 2008, Gabriel "seemed a little bit better." RT 28, 63. Rebecca did not remember whether Gabriel had eaten that morning, but she did remember playing peek-a-boo with him. RT 63-64. After Gabriel fell asleep on the living room couch, Petitioner suggested Rebecca go out and get her nails done. RT 29, 31. When Rebecca left the house to go to a nail salon that was approximately ten minutes away, Petitioner was outside playing football with Juan, Devon, and Austin, Rebecca's nine-year-old nephew. RT 30-31.

Thirty-five or forty minutes after Rebecca left the house, Petitioner called her to come home because there was something wrong with Gabriel's breathing. RT 31, 55. Rebecca asked Petitioner if he had called 911. RT 31-32. Petitioner told her he had not called 911 and stated, "I just want you to come home; I didn't want to jump the gun or anything." RT 32. Petitioner called Rebecca a second time while she was on her way home and told her to "hurry up." RT 56. Rebecca arrived back home within five minutes after receiving the first phone call from Petitioner. RT 56-57. She found Gabriel very pale and limp, his breathing light and shallow. RT 32-33. She immediately called 911. RT 32, 57. When the ambulance arrived, Rebecca went with Gabriel to the hospital. RT 33.

Once at the hospital, Rebecca called Petitioner and asked her to bring the boys. RT 34. On their way to the hospital, Petitioner took the three boys to an ice cream store to help them calm down. RT 94. He asked the boys which one of them would say he had dropped the baby. Id. Juan testified that Devon "said he'd take the blame because he thought people would believe it because he was the smallest at the time." Id.

### b. Plaintiff's Statements to a Social Worker and Law Enforcement

At the hospital, Petitioner spoke to Deborah Phillipson, the social worker assigned to Gabriel's case. RT 302-03. Phillipson described Petitioner's overall demeanor during the interview as "very polite, humble, very pleasant, [and]

cooperative." RT 313. According to Phillipson, Petitioner "seemed to be trying to give an accurate story." RT 314.

Petitioner began his statements to Phillipson by apologizing for having coached the children to lie about dropping Gabriel, but said he had been afraid he would be blamed for hurting Gabriel. RT 306-07.

Petitioner gave Phillipson the following account of what happened from the time Rebecca left the house until her return. Devon went inside the house alone twice to get a drink of water while the others were outside playing football, before Petitioner went inside to check on Gabriel. RT 307. Petitioner heard Gabriel crying, went inside to check on him, moved Gabriel from the couch to the crib in the bedroom, changed Gabriel's diaper, put a pacifier in his mouth, and then left Gabriel face down in the crib while he went back outside to continue playing football. RT 307-08. A few minutes later, Petitioner went back inside the house to check on Gabriel and found him to be limp, unresponsive, and "making weird noises." RT 308-09. Petitioner picked up Gabriel and shook him a little bit to see if he could wake him. RT 308. Petitioner demonstrated for Phillipson how he had held Gabriel up "with both of his hands, very lightly shaking the baby in a very slow, easy fashion." RT 322. When Gabriel did not respond, Petitioner performed CPR and called Rebecca and asked her to return home. RT 308.

Petitioner also spoke to Deputy Sheriff Francisco Campos at the hospital. RT 355-56. Petitioner told him that he and all three older boys came back into the house when they first heard Gabriel crying. RT 357-59. Juan accompanied Petitioner when he moved Gabriel from the living room to the bedroom, after which they both went to watch television with the other kids. RT 358-59. About ten minutes later, he and Juan returned to the bedroom together to check on Gabriel. RT 359-60. Gabriel appeared to be gasping for air, so Petitioner picked him up and shook him gently. RT 360. Petitioner then carried Gabriel into the

9

1   living room and put him down on the sofa.  RT 361.  Petitioner never said anything

2   to Campos about changing Gabriel's diaper.  RT 373.

3             **c.**        **Statements and Testimony of Juan**

4        Juan also spoke with Phillipson at the hospital.  RT 96.  Juan told Phillipson

5   that Petitioner had not done anything to Gabriel other than to gently shake him to

6   try to wake him up.  Id.  Juan told Phillipson both that he had been with Petitioner

7   the entire time Petitioner was with Gabriel; however, he also told her Petitioner

8   was alone in the bedroom with Gabriel for some period of time while Juan was out

9   in the living room with the other kids.  RT 311-12.  Juan also told Phillipson that

10  Petitioner first went inside the house to check on Gabriel because Gabriel could be

11  heard crying from outside.  RT 312.

12       At trial, Juan testified that at some point after Rebecca left to get her nails

13  done, Petitioner and the three boys came back inside the house.  RT 89-90.  Juan

14  and the other kids sat down to watch television while Petitioner went into the

15  bedroom to check on Gabriel.  RT 103-04.  Gabriel had already been moved from

16  the couch in the living room to the playpen in his bedroom, but Juan was not

17  present when Gabriel was moved.  RT 97-98, 103-04, 115-16.  Juan never heard

18  Gabriel crying.  RT 98, 101-02.  When Petitioner brought Gabriel out from the

19  bedroom, the infant looked pale and was having difficulty breathing, and his skin

20  was hot to the touch.  RT 90-91, 109.  Petitioner had a really hard grip on Gabriel,

21  saying "Madden, Madden, Madden" in an effort to revive him.  RT 96, 106.

22            **d.**        **Prosecution Medical Expert**

23       Dr. Sandra Murray,[3] an associate professor of pediatrics at the University of

24  California Irvine and interim medical director of the Orange County child abuse

25  service team, examined Gabriel on May 27, 2008 at the hospital.  RT 329-30.

26  Gabriel was in critical condition when he arrived at the hospital.  RT 335.  Dr.

27  _____

28  [3]    Petitioner's counsel stipulated that Dr. Murray qualified as an expert.  RT 329.

1   Murray observed Gabriel had no external signs of trauma or injury.  RT 331-32.

2   However, Dr. Murray observed Gabriel:

3        had bleeding in the brain, called a subdural hematoma, which is under

4        one of the membranes of the brain, which was on both sides of his

5        brain, but more on the left side than on the right.  And it was also in

6        between the two halves of the brain.  There was also indications on the

7        head C.T. of his brain being swollen and had lack of oxygen to it.

8   RT 332.  Gabriel had sustained damage to the parts of his brain affecting vision,

9   speech and motor skills.  RT 338-39.  Dr. Murray opined Gabriel had sustained

10   "abusive head trauma" or "shaken baby syndrome" caused by a violent back-and-

11   forth movement of his head.  RT 338, 340, 345.

12        Gabriel remained in the hospital and was examined again by Dr. Murray on

13   June 6, 2008.  RT 336.  Gabriel's condition had stabilized and ophthalmology was

14   able to dilate and examine his eyes.  Id.  Three small retinal hemorrhages were

15   discovered in one eye.  Id.  Dr. Murray admitted the retinal hemorrhaging was "a

16   fairly nonspecific finding."  Id.

17        Dr. Murray also testified there were "[n]o skull fractures or any fractures

18   anywhere else that we found on two skeletal surveys."  RT 340.  Nor did she find

19   any trauma to the chest or abdomen.  Id.  Dr. Murray testified the lack of fractures

20   or trauma to the chest or abdomen did not affect the abusive head trauma diagnosis.

21   Id.

22        Dr. Murray was not able to say exactly when the injury occurred, but stated

23   "the symptoms would have been in a very short time period after the event. . . .

24   From immediately to a few minutes."  RT 341, 348-49.  Based on "the extensive

25   injuries that [Gabriel] had, it would be unlikely that he had any significant period of

26   time where he would have been acting normally."  RT 348.  She testified that

27   "gentle shaking" or performing CPR would not have caused this type of injury.

28   RT 342.  She also opined that a six-year-old child does not have the strength to

cause this type of head trauma by shaking.  RT 342-43.  While a young child could have caused these injuries, Dr. Murray testified the young child would have to drop Gabriel "from an extreme height," and there was no evidence of this given Gabriel's other injuries.  RT 343.  She conclusively stated "[t]he head injury that we saw is not from any minor resuscitative efforts or lack of oxygen from another source."  RT 345.  The force required would have been "a very significant force. It's a very forceful back and forth movement of shaking or, you know, slamming onto soft surfaces where the head is moving back and forth in a very, what you would describe as a violent manner."  RT 352.

Although Gabriel had since showed some improvement, Dr. Murray testified he would never be able to see, walk, or speak.  RT 338-39.

### e.    Prior Bad Acts Testimony

Petitioner's ex-wife, Sarah, testified Petitioner's volatile temper was one reason for their divorce.  RT 69.  Sarah testified regarding specific incidents she witnessed.  Once when one of their sons was about six months old, Petitioner "lifted him off the ground by his arm [and] just told him to shut up" because he was crying.  Id.  This incident concerned Sarah because she "never saw somebody react to a crying baby that way."  Id.  Another time, when the other son was two or three years old, he was playing outside with some neighborhood kids when he pulled a little girl's hair.  RT 70.  Petitioner "just reacted and slapped him in the head, and [his son] wobbled and then fell to the ground."  Id.  Sarah got upset and yelled at Petitioner.  Id.  On another occasion, after finding a letter Sarah had written to a man who was in jail, Petitioner "completely lost it; he" grabbed a hammer and threatened to kill her.  RT 71-72.  Sarah ran outside and had her neighbor call the military police.  Id.  Another time, Petitioner shoved a chair at Sarah, causing her to fall backward and break her elbow.  RT 73.  Sarah told Phillipson, the social worker, that Petitioner could "go from zero to hot in a matter of seconds."  Id.

Rebecca also testified to prior bad acts she witnessed.  Once, when Petitioner was angry at Rebecca while they were at McDonald's, "he pulled the food out of the bag and threw cheeseburgers in [Rebecca's] face."  RT 38.  This happened in front of the children.  Id.  Rebecca saw Petitioner spank his own two sons with a belt when they were four and five years old, a punishment she considered excessive.  RT 41.  Rebecca told Petitioner it was unacceptable, she did not want to see him do that again in her house, and he was not to lay a hand on her children.  RT 45.

### 2.  Defense Case

The defense case consisted of a single witness, Dr. Jean Carlin, who testified as an expert in psychiatry.  RT 606-07.  Dr. Carlin was retained to interview Petitioner in order to determine his competency to stand trial and his mental state at the time of the incident.  RT 607, 609.  Dr. Carlin discussed Petitioner's self-reported history of having seen military action in Iraq, during which he had administered CPR to fallen comrades, and his self-reported history of subsequent psychological troubles.  RT 619-20.  Dr. Carlin also discussed an incident in which Petitioner's own newborn child had suffered a serious medical condition, but Petitioner could not be present because the military sent him to Kuwait.  RT 612.

Based upon her interview, Dr. Carlin opined Petitioner suffered from post-traumatic stress disorder ("PTSD").  RT 619.  Dr. Carlin testified someone suffering from PTSD could suffer flashbacks under certain circumstances, even in non-combat situations.  RT 614.  Dr. Carlin further testified a person suffering from PTSD's mindset and intent could be affected by stressful situations.  RT 614.  Hence, Petitioner's PTSD could have affected his "ability to think rationally" when trying to resuscitate Gabriel, because "his focus would have been on trying to get air into this baby's lungs, which would be probably his only focus because he's frantic."  RT 612-13.

///

**B.     CLOSING ARGUMENT AND VERDICT**

    **1.     Prosecution Closing Argument**

In her closing argument, the prosecutor began by summarizing the uncontested medical testimony.  The prosecutor argued the testimony established "in no uncertain terms" that (1) Gabriel had suffered brain injury as a result of a violent shaking; and (2) the violent shaking could have only occurred "during the time that the defendant handled the child."  RT 645-47.  The prosecutor then focused on the prior bad acts evidence to show Petitioner "has a violent temper, [and a] very low tolerance for infants and little babies."  RT 646.  Finally, she detailed her theory on how the victim sustained the injuries as follows:

> That the defendant, when he moved the child, who was crying, from the couch into the bedroom, he shook and violently shook the baby – holding the way he had demonstrated for Deputy Campos – shook the baby really hard to try to stop him from crying.
>
> . . .
>
> Placed the baby on the playpen.
>
> . . .
>
> [The] People believe that the defendant changed the diaper, handled the baby in many different ways, causing the baby to suffer this massive brain injury.  Even hitting baby on the playpen, which is on probably a soft surface, but throwing the baby down after he violently shakes the baby to stop him from crying.  And by the time the baby stops crying, he's already sustained injuries.  So then he leaves out of the room, but he goes back a few minutes later to check on the baby.  Why?  Because he knew he had done something to the baby and wanted to make sure the baby was okay.
>
> When he got back to the baby, he could see what damage he had already done to the child, and that's when he is trying to give him CPR

14

1    and other things to try to revive the baby himself because he didn't
2    want people to find out what had happened.
3    RT 652-54.

4    **2.    Defense Closing Argument**

5    Petitioner's counsel began her closing argument by conceding Petitioner's
6    actions caused Gabriel's traumatic brain injury, and only questioning whether the
7    shaking was intentional or accidental.  RT 648.  Petitioner's counsel stated:

8    The reason why we're here, your honor, is because both sides differ in
9    what really happened.  There is no disagreement that the child has
10   suffered a traumatic injury.  That's clear by the medical evidence.
11   What is not so clear, contrary to what counsel believes, is what
12   actually caused the injury.  Was it an intentional act by the defendant,
13   or was it an accidental act?

14   Id.

15   Petitioner's counsel then attempted to mitigate Petitioner having shaken
16   Gabriel by explaining that Petitioner's mental state and his inability to control
17   himself are:

18   a byproduct of his service to this nation; things that he came home
19   with.  He came home a walking wounded.  And as this court knows,
20   that is something that we are finally seeing in a greater degree in our
21   criminal system because it doesn't take a whole lot to go from being
22   law abiding and being of service to your country to falling in the cracks
23   and becoming a defendant much like Mr. Vanek when you are not give
24   the proper treatment.  And that's what happened here.

25   RT 650.

26   **3.    Verdict**

27   The court ruled as follows:

28

15

1         Based on the testimony and the evidence admitted, I find that

2    Mr. Vanek is guilty beyond a reasonable doubt of a violation of Penal

3    Code section 273(a) subsection (A).  This is a circumstantial evidence

4    case.  Mr. Vanek was the only person alone with victim Gabriel M.,

5    who, based on Dr. Murray's testimony, could have inflicted the

6    injuries sustained by the victim.  The defendant's actions, the failure

7    to call 911, attempting to have one of the children take the blame for

8    the victim's injuries are evidence to the court that he inflicted the

9    injuries.

10   RT 655-56.

## V.

### **STANDARD OF REVIEW**

13        Under the Antiterrorism and Effective Death Penalty Act of 1996

14   ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on

15   its merits in state court unless the adjudication:

16        (1) resulted in a decision that was contrary to, or involved an

17        unreasonable application of, clearly established Federal law, as

18        determined by the Supreme Court of the United States; or

19        (2) resulted in a decision that was based on an unreasonable

20        determination of the facts in light of the evidence presented in the

21        State court proceeding.

22   28 U.S.C. § 2254(d).

23        "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes

24   only 'the holdings, as opposed to the dicta, of th[e] [U.S. Supreme] Court's

25   decisions'" in existence at the time of the state court adjudication.  White v.

26   Woodall, ____ U.S. ____, 134 S. Ct. 1697, 1702, 1706, 188 L. Ed. 2d 698 (2014).

27   However, "circuit court precedent may be 'persuasive' in demonstrating what law

28

1   is 'clearly established' and whether a state court applied that law unreasonably."
2   <u>Maxwell v. Roe</u>, 628 F.3d 486, 494 (9th Cir. 2010).

3          Overall, AEDPA presents "a formidable barrier to federal habeas relief for
4   prisoners whose claims have been adjudicated in state court." <u>Burt v. Titlow</u>, ____
5   U.S. ____, 134 S. Ct. 10, 16, 187 L. Ed. 2d 348 (2013).  The federal statute presents
6   "a difficult to meet . . . and highly deferential standard for evaluating state-court
7   rulings, which demands that state-court decisions be given the benefit of the
8   doubt." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557
9   (2011) (internal citation and quotation marks omitted).  On habeas review, AEDPA
10  places the burden on petitioners to show the state court's decision "was so lacking
11  in justification that there was an error well understood and comprehended in
12  existing law beyond any possibility for fairminded disagreement." <u>Harrington v.</u>
13  <u>Richter</u>, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).  Put another
14  way, a state court determination that a claim lacks merit "precludes federal habeas
15  relief so long as fairminded jurists could disagree" on the correctness of that ruling.
16  <u>Id.</u> at 101.  Federal habeas corpus review therefore serves as "a guard against
17  extreme malfunctions in the state criminal justice systems, not a substitute for
18  ordinary error correction through appeal." <u>Id.</u> at 102-03 (internal citation and
19  quotation marks omitted).

20  **A.     THIS COURT WILL REVIEW CLAIM ONE TO DETERMINE**
21  **        WHETHER THE STATE COURT'S SUMMARY DENIAL WAS**
22  **        OBJECTIVELY UNREASONABLE.**

23          Where the last state court disposition of a claim is a summary denial, this
24  Court must review the last reasoned state court decision addressing the merits of
25  the claim under AEDPA's deferential standard of review.  <u>Maxwell</u>, 628 F.3d at
26  495; <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706
27  (1991).  However, where there is no reasoned state court decision, a summary
28  denial is presumed to be a decision "on the merits." <u>Richter</u>, 562 U.S. at 99.

17

1   Because there is no reasoned decision with respect to Claim One, the California

2   Supreme Court's April 9, 2014 summary denial (lodg. 16) is presumed to be a

3   decision on the merits.[4]  Richter, 562 U.S. at 99.  Hence, this Court must perform

4   an "'independent review of the record' and ascertain whether the state court's

5   decision was 'objectively unreasonable.'"  Walker v. Martel, 709 F.3d 925, 939

6   (9th Cir. 2013) (quoting Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000)).

7   **B.     THIS COURT WILL REVIEW CLAIMS TWO AND FOUR *DE***

8   ***NOVO*, BECAUSE THERE IS NO STATE COURT DECISION ON**

9   **THE MERITS.**

10          With respect to Claims Two and Four, the California Supreme Court

11  summarily denied Petitioner's claims with citation to In re Clark, 5 Cal. 4th 750,

12  767-69 (1993).[5]  Lodg. 20.  Where the last state court disposition of a federal claim

13  does not reach the merits and instead relies on a procedural bar later held

14  inadequate to foreclose federal habeas review, the Court must review the state

15  court's denial of the claim *de novo* and without deference.  See Pirtle, 313 F.3d at

16

---

17   [4]     Petitioner argues the Court should "look through" the California Supreme
18   Court's summary denial to the superior court's October 3, 2013 denial on
     erroneous procedural grounds as the last reasoned decision of his ineffective
19   assistance of counsel claim.  Pet. at 36-38.  Petitioner argues the superior court's
     denial on the grounds his claim "either was or should have been raised on appeal,"
20   lodg. 12, was erroneous because he could not have raised his claim on direct review.
     Id. at 36.  Petitioner argues, therefore, the Court should review Claim One *de novo*.
21   Id. (citing Sivak v. Hardison, 658 F.3d 898, 907 (9th Cir. 2011) ("an erroneously
     applied procedural rule does not bar federal habeas review")).

22          Petitioner misconstrues the superior court decision as a "reasoned" decision
     applying a procedural bar.  Pirtle v. Morgan, 313 F.3d 1160, 1168 (9th Cir. 2002)
23   ("[A] state's reliance on the relitigation rule does not amount to a ruling on the
     merits *or a denial on procedural grounds*.") (emphasis added); Her v. Jacquez, No.
24   2:09-CV-612-JAM (TJB), 2011 WL 1466868, at *9 (E.D. Cal. Apr. 18, 2011) ("A
     federal court instead must 'look through' a denial based on [California's
25   relitigation bar] to the last explained state court decision").  The superior court's
     October 3, 2013 decision is, thus, not an "explained" or "reasoned" decision as
26   those terms are defined in Nunnemaker.  See Nunnemaker, 501 U.S. at 803-04.
     Hence, there is no reasoned decision on Claim One.

27   [5]     The California Supreme Court's citation to pages 767-69 of In re Clark refers
28   to California's bar against successive habeas petitions.  In re Clark, 5 Cal. 4th at
     767-69.

1   1167; see also Cone v. Bell, 556 U.S. 449, 472, 129 S. Ct. 1769, 173 L. Ed. 2d 701

2   (2009) (where state court relies on an inadequate procedural bar and does not

3   address merits, "federal habeas review is not subject to the deferential standard

4   that applies under AEDPA to 'any claim that was adjudicated on the merits in State

5   court proceedings'") (quoting 28 U.S.C. § 2254(d)).

6       Respondent argues Claims Two and Four are procedurally barred.  Answer

7   at 40-42.  However, because Petitioner's claims are easily resolved on the merits,

8   while the procedural default argument is much more complex, in the interest of

9   judicial economy, this Court considers Claims Two and Four on the merits rather

10  than addressing the procedural default issue.  See 28 U.S.C. § 2254(b)(2) (district

11  court has authority to deny unexhausted claims on their merits); see also Lambrix

12  v. Singletary, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997); Franklin

13  v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).

14  **C.  THIS COURT WILL REVIEW THE CALIFORNIA COURT OF**

15  **APPEAL'S REASONED DECISION ON CLAIM THREE UNDER**

16  **AEDPA'S DEFERENTIAL STANDARD OF REVIEW.**

17      With respect to Claim Three, the California Court of Appeal's April 2, 2013

18  opinion disposing of Petitioner's direct appeal stands as the last reasoned decision.

19  See lodg. 6.  Maxwell, 628 F.3d at 495; see also Berghuis v. Thompkins, 560 U.S.

20  370, 380, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (when a state supreme court

21  denies discretionary review of a decision on direct appeal, the appellate court's

22  decision is the relevant state-court decision for purposes of AEDPA's standard of

23  review).  The Court of Appeal's reasoned decision will, thus, be reviewed under

24  AEDPA's deferential standard of review for claims "adjudicated on the merits."

25  28 U.S.C. § 2254(d); Richter, 562 U.S. at 99.

26  ///

27  ///

28  ///

19

# VI.

## DISCUSSION

**A.    CLAIM ONE WARRANTS HABEAS RELIEF**

    **1.    Petitioner's Claim**

In Claim One, Petitioner argues his trial counsel was ineffective because she failed to investigate the state's medical case, consult with a medical expert who could have rebutted the state's medical evidence, or retain or present such a defense medical expert at trial.  Pet. at 18.

    **2.    Additional Factual Background**

        **a.    Evidence Presented In Petitioner's First California Supreme Court Habeas Petition**

In his verified habeas petition addressed to the original jurisdiction of the California Supreme Court, Petitioner's appellate counsel made the following factual allegations under penalty of perjury.  Lodg. 15.

First, Petitioner's appellate counsel alleged "trial counsel failed to investigate the medical evidence in this case, failed to consult a doctor with expertise relevant to the baby's injuries in this case, and failed to present a defense expert witness at trial capable of rebutting the testimony of the prosecution's doctor."  Id. at 4.  This allegation was augmented by a letter from Petitioner's trial counsel in which she confirms her failure to call an expert and offers the following explanation:

> I did not call an expert to challenge the DA's expert because the finding of the DA expert regarding the injuries was irrelevant to my defense.  Mr. Vanek admitted that during his efforts to revive the baby he did shake him several times.  My position was his culpability was mitigated or excused by virtue of his mental health issues, his PTSD.

Id. at Ex. IV.

Second, Petitioner's appellate counsel alleged "medical evidence was available that would have thoroughly impeached the prosecution's medical expert." Id. at 5. This allegation was supported by a declaration from Michael R. Weinraub, M.D., FAAP, a board-certified pediatrician for over thirty-five years and an expert in Shaken Baby Syndrome, child physical abuse, and child and adolescent growth and development. Id. at Ex. I, Ex II. Dr. Weinraub explains "Shaken Baby Syndrome" is the term "for a potential diagnosis of infants who present with a common triad of signs and symptoms, including (1) subdural hematoma (bleeding in the brain), (2) encephalopathy/cerebral edema (swelling of the brain), and (3) retinal hemorrhaging (bleeding in the eyes)." Id. at Ex. I ¶ 3. However, pursuant to the medical science that was "substantially known/established" at the time Dr. Murray diagnosed Gabriel in May 2008, in the absence of additional corroborating evidence (such as spinal or neck injuries), historical assumptions regarding the causation and timing of the triad of signs and symptoms that would lead to a Shaken Baby Syndrome diagnosis were and are no longer considered medically sound. Id. at ¶¶ 4-5, 18. Specifically, Dr. Weinraub opines as follows:

    (A) The triad of signs and symptoms is not necessarily caused by violent shaking. Id. at ¶ 6.

    (B) The infant's medical deterioration does not necessarily appear immediately or within a few minutes of having been violently shaken. Id. at ¶ 7.

    (C) Shaking alone without impact is unlikely to produce intracranial injury without first causing injury to the spinal cord, spinal column, or neck. Id. at ¶ 8.

Dr. Weinraub explains a more thorough medical investigation would have been considered by any competent attending pediatrician to be both necessary and routine in cases like this. Id. at ¶¶ 11, 25. He opines the absence of any neck injuries, factures, bruises, or other indications of trauma is inconsistent with a

Shaken Baby Syndrome diagnosis and suggests a non-traumatic or accidental cause of the child's signs and symptoms.  Id.  For example, based on the records available which reveal both newer and older subdural hematomas as well as the blood clot in Gabriel's leg, Dr. Weinraub opines it is likely Gabriel suffered from a pre-existing medical condition that may have been present from birth, such as chronic bleeding on the brain or a coagulation or hypercoagulation disorder.  Id. at ¶¶ 13-14.

**b.**    **Additional Evidence Presented In Petitioner's Second California Supreme Court Habeas Petition**

In support of Petitioner's second habeas petition to the California Supreme Court, Petitioner included a declaration from his trial counsel which elaborates on the letter previously included in the first habeas petition.  Lodg. 19 at Ex. 4 (Declaration of Barbara McDaniel ("McDaniel Decl.")).  Ms. McDaniel explains:

> I did not consult with any medical experts regarding the medical evidence in Mr. Vanek's case, nor did I call at trial a pediatrician, medical doctor, or other medical expert to challenge the testimony of the state's medical expert regarding the infant victim's injuries.

> I did not consult with or call at trial an expert to challenge the state's medical expert because I considered the finding of the state's medical expert regarding the victim's injuries to be irrelevant to my defense.  My understanding was that Mr. Vanek had admitted that during his efforts to revive the infant victim he did shake the infant several times.

> My position was that Mr. Vanek's culpability was mitigated or excused by virtue of his mental health issues, i.e. his PTSD.

Id. at ¶¶ 2-4.[6]

---

[6]    Because the relevant state court decision is the first California Supreme Court summary denial of Claim One, the Court declines to consider the McDaniel Declaration in its determination of whether the state court's decision was "objectively unreasonable."  See Pinholster, 131 S. Ct. at 1398-99.  However, as discussed below, because the Court finds the state court's decision was objectively

### 3.    Legal Standard

For Petitioner to prevail on his ineffective assistance of counsel claim, he must satisfy a two-prong test: (1) counsel's performance was deficient, and (2) prejudice resulted from the deficient performance.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  A court evaluating an ineffective assistance of counsel claim does not need to address both components of the test if a petitioner cannot sufficiently prove one of them.  Id. at 697; see also Thomas v. Borg, 159 F.3d 1147, 1152 (9th Cir. 1998).

"Strickland[] . . . was designed to protect the Sixth Amendment right to 'a reliable adversarial testing process.'"  Elmore v. Ozmint, 661 F.3d 783, 859 (4th Cir. 2011), as amended (Dec. 12, 2012).  When a defendant's "lawyer neither investigate[s], nor ma[kes] a reasonable decision not to investigate, . . . [s]uch a complete lack of pretrial preparation puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution, and the reliability of the adversarial testing process."  Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986) (internal citations and quotation marks omitted).

To prove deficient performance, a petitioner must show his counsel's representation fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 687-88.  However, establishing counsel's deficient performance does not warrant setting aside the judgment if the error had no effect on the judgment.  Id. at 691; see also Seidel v. Merkle, 146 F.3d 750, 757 (9th Cir. 1998).  Thus, a petitioner must also show prejudice, such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.

---

unreasonable, the McDaniel Declaration is evidence the Court has considered on *de novo* review of Petitioner's claim of ineffective assistance of counsel.

1    Moreover, a habeas court's review of a claim under the <u>Strickland</u> standard

2  is "doubly deferential."  <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411,

3  173 L. Ed. 2d 251 (2009).   The relevant question "is not whether a federal court

4  believes the state court's determination under the <u>Strickland</u> standard was

5  incorrect but whether that determination was unreasonable – a substantially higher

6  threshold."  <u>Id.</u> (citations omitted).

7        **4.    Analysis**

8            **a.    Deficient Performance**

9    While <u>Strickland</u> is a general standard, the United States Supreme Court has

10  provided guidance on applying <u>Strickland</u> when defense counsel fails to undertake

11  reasonably necessary investigation.  The Supreme Court has observed counsel's

12  function "is to make the adversarial testing process work in the particular case."

13  <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305

14  (1986) (quoting <u>Strickland</u>, 466 U.S. at 690).  "Because that testing process

15  generally will not function properly unless defense counsel has done some

16  investigation into the prosecution's case and into various defense strategies, [the

17  Court] noted that 'counsel has a duty to make reasonable investigations or to make

18  a reasonable decision that makes particular investigations unnecessary.'"

19  <u>Kimmelman</u>, 477 U.S. at 384.

20    In <u>Kimmelman</u>, the Supreme Court found petitioner's trial counsel deficient

21  for failing to request pretrial discovery that would have revealed the grounds for a

22  motion to suppress key evidence.  <u>Id.</u> at 385.  The Supreme Court concluded

23  counsel's failure to request discovery was not based on "strategy," but on

24  counsel's mistaken belief that the State was obliged to turn over all inculpatory

25  evidence to the defense.  <u>Id.</u>  The Supreme Court found counsel's "vigorous cross-

26  examination, attempts to discredit witnesses, and effort to establish a different

27  version of the facts" did not remedy "a total failure to conduct pre-trial discovery,

28  and one as to which counsel offered only implausible explanations."  <u>Id.</u> at 385-86.

1    Therefore, the Court concluded counsel's performance fell below the level of
2    reasonable professional assistance.

3        In Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389
4    (2000), the Supreme Court found petitioner's trial counsel deficient for failing to
5    conduct an investigation that would have uncovered extensive records that could
6    be used for death penalty mitigation purposes because counsel incorrectly believed
7    state law barred access to such records.  Id. at 395.  The Supreme Court noted trial
8    counsel chose to focus solely on the fact that petitioner had self-surrendered, and
9    the weight of defense counsel's closing argument "was devoted to explaining that
10   it was difficult to find a reason why the jury should spare Williams' life."  Id. at
11   369, 395.  The Court found counsel's "failure to introduce the comparatively
12   voluminous amount of evidence that did speak in Williams' favor was not justified
13   by a tactical decision to focus on Williams' voluntary confession."  Id. at 396.
14   Therefore, the Court concluded counsel's performance "fell short of professional
15   standards," because their failure to conduct an investigation was "not because of
16   any strategic calculation," but based on incorrect beliefs regarding state law.  Id. at
17   395.

18       Finally, in Hinton v. Alabama, ___ U.S. ___, 134 S. Ct. 1081, 188 L. Ed. 2d 1
19   (2014), the Supreme Court found petitioner's trial counsel deficient for failing to
20   request funds to consult or introduce a rebuttal expert.  Petitioner was charged with
21   two counts of capital murder for killings during two robberies, but was not charged
22   with a similar shooting of a third restaurant manager during a third robbery.  Id. at
23   1083.  The Supreme Court found the "only evidence linking Hinton to the two
24   murders were forensic comparisons of the bullets recovered from those crime
25   scenes to the Hinton revolver."  Id. at 1084.  "After analyzing the six bullets fired
26   during the three crimes and test-firing the revolver, examiners at the State's
27   Department of Forensic Sciences concluded that the six bullets had all been fired
28   from the same gun: the revolver found at Hinton's house."  Id.  At trial, the

prosecution's two experts "maintained that all six bullets had indeed been fired from the Hinton revolver." Id. at 1085.  While defense counsel recognized the need for an effective rebuttal of the State's firearms and toolmark forensic expert witness, counsel failed to request additional funding for an expert witness because he was unaware that state law did not limit expert funding, but permitted reimbursement for any expenses reasonably incurred. Id. at 1084-85.  The only expert petitioner's counsel was able to hire for the amount he believed he was limited to spending was discredited by the prosecution because his expertise "was in military ordnance, not firearms and toolmark identification, and . . . [the expert] had graduated in 1933 (more than half a century before the trial) with a degree in civil engineering." Id. at 1085.  The Court found this was a case "where the only reasonable and available defense strategy require[d] consultation with experts or introduction of expert evidence," because "the core of the prosecution's case was the state experts' conclusion that the six bullets had been fired from Hinton's revolver, and effectively rebutting that case required a competent expert on the defense side." Id. at 1089.  The Court held petitioner's counsel's inadequate performance was the "inexcusable mistake of law . . . that caused counsel to employ an expert that *he himself* deemed inadequate." Id.  The Court held "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Id.

The Ninth Circuit has also provided relevant guidance on the proper interpretation of Strickland when counsel fails to consult with and call an expert. In Conwell v. Woodford, 312 F. App'x 58 (9th Cir. 2009),[7] petitioner was charged with involuntary manslaughter, and testimony from the prosecution's forensic pathologist was critical in establishing that petitioner's actions led to the victim's

_____

[7]   The Court may cite unpublished Ninth Circuit opinions issued on or after January 1, 2007.  U.S. Ct. App. 9th Cir. Rule 36-3(b); Fed. R.App. P. 32.1(a).

death.  Id. at 59-60.  However, defense counsel neither called a forensic pathologist to testify, nor consulted with a pathologist to determine whether such testimony would be helpful.  Id.  The Ninth Circuit found the state court's finding of no Strickland violation was objectively unreasonable, in that "[t]he decision to rely solely on cross-examination of the prosecution's expert forensic pathologist was not a reasonable strategic choice because it was not based on a thorough investigation of the available options."  Id. at 60.

Similarly, in Duncan v. Ornoski, 528 F.3d 1222, 1235-36 (9th Cir. 2008), defense counsel failed even to consult an expert, and thus had no basis for forgoing an expert at trial.  Id. at 1235-36.  Petitioner was charged with robbery and first-degree murder.  Id. at 1225.  The prosecution's expert criminologist for the Serology Section of the Los Angeles Police Department testified that he tested three blood samples from the crime scene, which were all inconsistent with the victim's blood type.  Id. at 1228.  Petitioner's blood was never given to the prosecution's expert to test and he was therefore unable to determine whether petitioner's blood was consistent – or inconsistent – with the blood found at the crime scene that did not belong to the victim.  Id. at 1228-29.  The Ninth Circuit held petitioner's counsel's failure to obtain a serology expert and to have blood tests performed prejudiced petitioner because it would have raised substantial doubt as to whether petitioner was the actual killer.  Id. at 1233.  The Ninth Circuit noted "[t]his court has repeatedly held that '[a] lawyer who fails adequately to investigate and introduce . . . [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.' "  Id. at 1234; see also Heath v. Hill, 397 F. App'x 308, 312 (9th Cir. 2010) (affirming grant of habeas relief); Caro v. Woodford, 280 F.3d 1247, 1255-56 (9th Cir. 2002).

This case is not materially distinguishable from the three United States Supreme Court cases discussed above where an attorney's failure to present a

defense was not because of a strategic calculation, but because the attorney made an incorrect assumption and failed to conduct any investigation into the validity of the defense.  Here, Petitioner's counsel incorrectly assumed Petitioner had admitted guilt by stating he had held Gabriel up "with both of his hands, very lightly shaking the baby in a very slow, easy fashion."  RT 322.  However, as the prosecution's own expert testified, "gentle shaking" or performing CPR would not have caused this type of injury.  RT 342.  The "core of the prosecution's case" was the prosecution expert who testified (1) Gabriel's injuries could only have been caused by intentional violent shaking, and (2) Petitioner was the only individual who was with Gabriel during the relevant time period who could have inflicted such injuries.  The prosecution's expert, therefore, established both the *cause* of injuries and the *perpetrator* of the injuries.  Thus, as in Hinton, this is a case "where the only reasonable and available defense strategy require[d] consultation with experts or introduction of expert evidence."  Hinton, 134 S. Ct. at 1089 (citing Richter, 562 U.S. at 106).  Counsel's failure to consult or introduce a rebuttal expert was not a reasonable tactical decision, but rather an inexcusable failure to investigate and present critical evidence.  See Conwell, 312 F. App'x 58.  Under these circumstances, no reasonable jurist could find defense counsel's failure to investigate or present an expert was reasonable.

Respondent argues "trial counsel had reasonable, tactical grounds for not calling a defense medical expert to challenge Dr. Murray's trial testimony."  Answer at 20.  Respondent argues trial counsel's determination that Dr. Murray's testimony regarding the injuries was irrelevant to her defense was reasonable, because (a) Petitioner "admitted that during his efforts to revive the baby he did shake him several times," and (b) "trial counsel's 'position was [Petitioner's] culpability was mitigated or excused by virtue of his mental health issues, his PTSD.'"  Id.  Respondent argues trial counsel "made the tactical decision to focus

1    Petitioner's defense on his posttraumatic stress disorder through the testimony of

2    Dr. Carlin." Id. at 22.

3         Respondent's arguments fail because here, defense counsel assumed

4    Petitioner was guilty on the basis of his "admission" that he gently shook Gabriel a

5    couple times *after* Gabriel was non-responsive (i.e., "in order to revive the baby").

6    However, even the prosecution's expert, Dr. Murray, testified such light shaking

7    would not have caused the injuries.  RT 342.  Therefore, even minimal

8    investigation would have revealed trial counsel's assumption was unreasonable.

9    Hence, trial counsel's decision to focus solely on *mitigating* Petitioner's culpability

10   rather than investigating and pursuing a defense that could *exculpate* him was the

11   result of an inexcusable failure to investigate and is simply indefensible.[8]  As in

12   Hinton, Williams, and Kimmelman, an incorrect assumption does not transform

13   the failure to conduct investigation into a reasonable strategic decision.  Hence, a

14   state court's finding that Petitioner's counsel was not deficient would be an

15   objectively unreasonable application of federal law.

16   ///

17   ///

18   _____

19   [8]   Throughout the Objections to the original Report and Recommendation,
     Respondent claims Petitioner's trial counsel pursued a defense of "accident" that
20   "would have exculpated Petitioner because the accident defense would have shown
     that the prosecution failed to prove the intent element of the crime of felony child
21   abuse."  Dkt. 83, Resp. Objections at 18.  However, to the extent defense counsel
     was attempting to argue Petitioner accidentally caused the injury when he gently
22   shook Gabriel after Gabriel was nonresponsive, Dr. Murray's testimony precluded
     the defense of accident, because she testified the injury had to have occurred *before*
23   Gabriel was nonresponsive.  RT 345-46 ("That's extremely unlikely.  And
     something else already happened to the baby that caused them to be unresponsive
24   in the first place.").  Thus, while a defense of accident could have negated the
     general intent element of the crime, Petitioner's trial counsel never argued the
25   shaking that caused the injury was an accident.  Rather, Petitioner's trial counsel
     only argued that *after* Gabriel was nonresponsive Petitioner's "actions, the failure
26   to call 911, attempting to have one of the children take the blame for the victim's
     injuries" may have been explained by his PTSD.  Therefore, trial counsel's defense
27   of accident as actually argued only sought to mitigate, rather than exculpate,
     Petitioner's liability, and hence left him without any effective defense.  See Luna v.
28   Cambra, 306 F.3d 954 amended in 311 F.3d 928 (9th Cir. 2002) (quoting Brown v.
     Myers, 137 F.3d 1154 (9th Cir. 1998)).

1

              **b.**    **Prejudice**

2        Under Strickland, prejudice is established when "it is 'reasonably likely' the

3    result would have been different." Richter, 562 U.S. at 111-12. "[I]f there is a

4    reasonable probability that [trial counsel] would have hired an expert who would

5    have instilled in the jury a reasonable doubt as to [his client's] guilt . . . then [the

6    client] was prejudiced by his lawyer's deficient performance . . . ." Hinton, 134 S.

7    Ct. 1089; see also Yun Hseng Liao v. Junious, 817 F.3d 678 (9th Cir. 2016). In

8    analyzing whether a petitioner was prejudiced by trial counsel's failure to call an

9    expert witness, courts look to whether the petitioner has provided evidence

10    contradicting the prosecution's experts and the strength of the other evidence

11    against the petitioner. Id. at 112-13.[9]

12        The Ninth Circuit recently reversed a district court's finding of no prejudice

13    in a case where petitioner's defense was a lack of intent caused by a sleep disorder,

14    and trial counsel failed to secure an expert to conduct a sleep study on petitioner.

15    Liao, 817 F.3d 678. The court found the state court's decision that petitioner had

16    not suffered prejudice "not just merely incorrect, but 'objectively unreasonable.' "

17    Id. at 694 (quoting Renico v. Lett, 559 U.S. 766, 773, 130 S. Ct. 1855, 176 L. Ed. 2d

18    678 (2010)). In Luna v. Cambra, 306 F.3d 954 amended in 311 F.3d 928 (9th Cir.

19    2002), and Brown v. Myers, 137 F.3d 1154 (9th Cir. 1998), the Ninth Circuit

20    similarly found prejudice established where counsel failed to call available

21    witnesses to corroborate the petitioners' alibi defenses, and the petitioners' "bare

22    testimony left [them] without any effective defense." Luna, 306 F.3d at 961

23    (quoting Brown, 137 F.3d at 1158).

24

25

26    [9]    In Richter, the United States Supreme Court found petitioner failed to
establish prejudice because he did not offer evidence directly contradicting the
27    prosecution's experts and there was substantial circumstantial evidence supporting
petitioner's conviction. Richter, 562 U.S. at 112-13. Here, as detailed, Petitioner
28    offers evidence directly contradicting the prosecution's expert and substantial
circumstantial evidence did not support his conviction.

Here, there is a reasonable probability the finder of fact would have had a reasonable doubt as to guilt if Petitioner's counsel had investigated and called a rebuttal expert.  Petitioner has presented evidence *directly contradicting* Dr. Murray's testimony regarding both the cause of Gabriel's injuries and the timing of the injuries.  Dr. Murray testified: (1) Gabriel's injuries were caused by a violent back-and-forth movement of his head, RT 338, 340, 345; (2) the symptoms would have been exhibited in a very short time, meaning from immediately to a few minutes, after the event, RT 341; and (3) "the lack of [fractures] does not change the diagnosis," RT 340.  In direct contrast, Dr. Weinraub states the science relied upon by the prosecution expert (i.e., the triad of symptoms) was no longer considered medically sound at the time Gabriel was diagnosed in May 2008.  Id. at ¶¶ 4-5, 18.  Specifically, Dr. Weinraub explains: (1) the triad of signs and symptoms is not necessarily caused by violent shaking; (2) an infant's medical deterioration does not necessarily appear immediately or within a few minutes of having been violently shaken; and (3) shaking alone without impact is unlikely to produce intracranial injury without first causing injury to the spinal cord, spinal column, or neck, and no such other injuries were present here.  Weinraub Decl., ¶¶ 6-8.

Dr. Weinraub also suggests a plausible non-violent cause of injury.  Based on the records available which reveal both newer and older subdural hematomas as well as the blood clot in Gabriel's leg, Dr. Weinraub opines it is likely Gabriel suffered from a pre-existing medical condition that may have been present from birth, such as chronic bleeding on the brain or a coagulation or hypercoagulation disorder.  Id. at ¶¶ 13-14.

In rendering a guilty verdict, the trial court found Petitioner "was the only person alone with the victim, Gabriel M., who, ***based on Dr. Murray's testimony***, could have inflicted the injuries sustained by the victim."  RT 656 (emphasis added).  Had trial counsel introduced an expert to explain that the science relied upon by Dr. Murray was no longer medically sound, and rebut Dr. Murray's

31

testimony regarding the cause or timing of the injuries, no reasonable jurist could find it is not "reasonably likely" the result would have been different. See Pinholster, 131 S. Ct. at 1403; Bemore v. Chappell, 788 F.3d 1151, 1174 (9th Cir. 2015) (unreasonable application of Strickland to ineffective assistance of counsel penalty phase claim).

Moreover, the other evidence against Petitioner – Petitioner's "actions, the failure to call 911, attempting to have one of the children take the blame for the victim's injuries" – was circumstantial and weak. Such evidence is insufficient to support Petitioner's conviction – particularly in light of the testimony of Dr. Carlin who explained how Petitioner's PTSD diagnosis could have affected his actions. The Court further notes Dr. Carlin's testimony would have been more persuasive and credible if a defense expert had provided alternative theories as to both (1) the cause of Gabriel's injuries, and (2) who could have caused such injuries. Finally, as discussed in further detail below in Section VI.C.4., counsel's deficiency was exacerbated by the trial court's admission of prior bad acts evidence which largely served to portray Petitioner as someone with a violent temper (i.e., someone with the character to commit the charged offense).

Respondent argues Petitioner has failed to show prejudice, because (1) the primary defense at trial was that Petitioner's culpability was mitigated by his PTSD rather than causation, and (2) "Petitioner fails to show that the trial court would have *necessarily* found any defense expert more credible than Dr. Murray during Petitioner's court trial." Answer at 23-24 (emphasis added). Respondent's first argument hinges on trial counsel's unreasonable, uninvestigated assumption, discussed above, that her client had admitted guilt. Respondent's second argument misstates the applicable law. Strickland/Richter does not require Petitioner to prove his actual innocence.[10]

---

[10]    In the Objections to the original Report and Recommendation, Respondent cites Gimenez, 2016 WL 2620284, and argues Petitioner cannot show prejudice because "past, evolving, and current professional opinions concerning shaken baby

1      This is one of those rare cases where the key evidence linking a defendant to

2  the cause of a child's injuries is the testimony of a prosecution expert witness that

3  (1) there could not have been a non-criminal cause of the injuries; and (2)

4  defendant was the only person present at the time the injury necessarily occurred.

5  In such a rare case, Petitioner's trial counsel's decision not to consult with or call a

6  rebuttal expert left the fact finder with no alternative to the prosecution's theory

7  that intentional violent shaking caused Gabriel's injuries, and Petitioner was the

8  only person who could have inflicted such injuries.  Counsel's errors left Petitioner

9  "without any effective defense," Luna, 306 F.3d at 961 (quoting Brown, 137 F.3d

10  at 1158), and left the fact finder no other alternative but to find Petitioner guilty.

11      Under these circumstances, no reasonable jurist could find Petitioner was

12  not prejudiced by counsel's failure to investigate or present an expert witness.

13  Accordingly, the Court finds the state court's determination under Strickland was

14  objectively unreasonable.  Knowles, 556 U.S. at 123.

15            **c.    Upon *De Novo* Review, Petitioner Is Entitled To Habeas**

16                   **Relief On Claim One.**

17      Having found the state court's decision was objectively unreasonable, the

18  Court will review Petitioner's claim *de novo*.  Yun Hseng Liao, 817 F.3d 678

19  (reviewing claim *de novo* after finding the state court's decision was "objectively

20  unreasonable" and granting habeas relief on ineffective assistance of counsel

21  claim).

22      If a petitioner's claims are resolvable by reference to the state-court record, a

23  federal habeas court may adjudicate the claims on the basis of that existing record.

24  Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998).  However, because the state

25

26  syndrome, or abusive head trauma, demonstrate a vigorous debate within the
scientific community."  Resp. Objections at 21.  First, in Gimenez the court never

27  reached the merits of the petitioner's claim of ineffective assistance of counsel.
Second, as already discussed above, Respondent's argument misstates the

28  applicable law because Strickland and Richter do not require Petitioner to prove his
actual innocence.

1    court summarily denied Petitioner's ineffective assistance of counsel claim without

2    an evidentiary hearing, Petitioner has not "failed to develop" the factual record in

3    the state court, and the Court may now consider the Declaration of Ms. McDaniel

4    as part of the evidentiary record supporting Petitioner's claims. See 28 U.S.C. §

5    2254(e); Williams v. Taylor, 529 U.S. 420, 437, 120 S. Ct. 1479, 146 L. Ed. 2d 435

6    (2000) ("Diligence will require in the usual case that the prisoner, at a minimum,

7    seek an evidentiary hearing in state court in the manner prescribed by state law.").

8         Upon de novo review, the Declaration of Ms. McDaniel provides the

9    necessary evidentiary support for Petitioner's allegations of trial counsel's deficient

10   performance, and, in conjunction with the Declaration of Dr. Weinraub and the

11   records of the trial court proceedings, provides sufficient evidence for this Court to

12   find Petitioner was denied effective assistance of counsel at trial.

13        Thus, Petitioner is entitled to habeas relief on Claim One.

14   **B.    CLAIM TWO DOES NOT WARRANT HABEAS RELIEF**

15        **1.    Background**

16        In Claim Two, Petitioner argues his conviction was obtained through the

17   state's presentation of false evidence in violation of Petitioner's Fourteenth

18   Amendment due process rights.  Pet. at 40-41.  Petitioner argues "Dr. Murray's

19   conclusions regarding the causation and timing of the injuries in this case were

20   substantially based on outdated and invalid assumptions and failed to acknowledge

21   the full range of possible explanations for the baby's signs and symptoms in this

22   case."  Id. at 27.

23        **2.    Legal Standard**

24        "[I]t is established that a conviction obtained through use of false evidence,

25   known to be such by representatives of the State, must fall under the Fourteenth

26   Amendment," and "[t]he same result obtains when the State, although not

27   soliciting false evidence, allows it to go uncorrected when it appears."  Napue v.

28   Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  The Supreme

1   Court has "consistently held that a conviction obtained by the knowing use of

2   perjured testimony is fundamentally unfair." United States v. Agurs, 427 U.S. 97,

3   103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

4        However, a "disagreement in expert opinion" does not establish that expert

5   testimony was false. Harris v. Vasquez, 949 F.2d 1497, 1524 (9th Cir. 1990)

6   (finding the fact that petitioner's current experts believed his doctor at trial

7   rendered an improper psychiatric diagnosis due to an allegedly inadequate

8   examination does not establish that any testimony was false); Mickle v. Chappell,

9   No. C 92-2951 TEH, 2014 WL 3866614, at *13 (N.D. Cal. Aug. 5, 2014) (finding

10   prosecution's expert witness' testimony was not false merely because it conflicts

11   with petitioner's current experts on habeas review).

12       **3.   Analysis**

13        First, there is no evidence the prosecutor knowingly presented false evidence

14   or had any reason to believe Dr. Murray's testimony was false. Petitioner argues

15   the Ninth Circuit does not require *knowing* presentation of false evidence. Pet. at

16   49; Traverse at 42-44 (citing United States v. Young, 17 F.3d 1201, 1204 (9th Cir.

17   1994)). However, this Court need not resolve whether unwitting presentation of

18   false evidence is sufficient to support Petitioner's claim because, as detailed below,

19   Petitioner fails to establish Dr. Murray's testimony was actually false.[11]

20   _____

21   [11]   In his Objections, Petitioner argues he only needs to establish Dr. Murray's
testimony was flawed rather than actually false. Pet. Objections at 2 (citing

22   Gimenez, 2016 WL 2620284). Notably, the Ninth Circuit denied the petitioner's
false testimony claim in Gimenez, finding the petitioner presented nothing more

23   than a battle between experts. The Ninth Circuit also denied petitioner's due
process claim that the introduction of "faulty evidence" violated his right to a

24   fundamentally fair trial, because petitioner failed to show the scientific community
had repudiated triad-only SBS. Gimenez, 2016 WL 2620284, at *1144-45 (finding

25   petitioner "presented literature revealing not so much a repudiation of triad-only
SBS, but a vigorous debate about its validity within the scientific community.").

26       As discussed below, while Dr. Weinraub's declaration is strong evidence
refuting Dr. Murray's testimony, it does not establish Dr. Murray's testimony to

27   be false or flawed, because it does not repudiate the validity of the science upon
which Dr. Murray based her testimony. Thus, as in Gimenez, Petitioner presents a

28   battle between experts and vigorous debate within the scientific community which
does not warrant relief on his false testimony claim.

1    Petitioner argues Dr. Murray's conclusion that the triad of symptoms was

2  sufficient to diagnose Abusive Head Trauma was false.  Pet. at 40.  Dr. Murray

3  testified "the lack of [fractures] does not change the diagnosis."  RT 340.

4  Whereas, Dr. Weinraub states in his declaration that:

5         shaking alone without impact . . . is unlikely to produce intracranial

6         injury without first causing injury to the spinal cord, spinal column, or

7         neck. . . . In cases in which an infant has been violently shaken with

8         sufficient strength to produce the triad of signs and symptoms

9         traditionally associated with Shaken Baby Syndrome, the infant

10        typically presents with one or more of these indications of trauma.

11 Pet. at Ex. 1.

12        Petitioner also argues Dr. Murray's conclusion that the signs and symptoms

13 necessarily appeared immediately or within minutes of being violently shaken was

14 false.  Pet. at 40.  Dr. Murray testified the symptoms would have been exhibited in

15 a very short time, meaning from immediately to a few minutes, after the event.  RT

16 341.  She then testified:

17        Q.    Now, is it possible that a child can suffer a traumatic brain

18        injury and still have a period of lucid interval?

19        A.    It would depend on the brain injury, but the extensive injuries

20        that he had, it would be unlikely that he had any significant period of

21        time where he would have been acting normally.

22        Q.    But you have no way of knowing how long before the baby went

23        into the degree of his distress that the injury was suffered, do you?

24        You had no way of pinpointing the exact timing?

25        A.    No.

26        Q.    So you don't know whether it was a few minutes before or even

27        a few hours before, do you?

28        A.    Unlikely to be a few hours.

1      Q.    But you have no way of pinpointing precisely?

2      A.    I cannot pinpoint precisely.

3 RT 348-49. Dr. Weinraub states in his declaration: "Even in cases where the infant

4 has been violently shaken, the infant's signs and symptoms may not appear until

5 hours or even days after the traumatic event." Pet. Ex. 1.

6      While Dr. Weinraub's declaration is strong evidence refuting Dr. Murray's

7 testimony, it does not establish Dr. Murray's testimony to be false. Harris, 949

8 F.2d at 1524. Rather, Petitioner has established a disagreement in expert opinion

9 regarding the interpretation of the medical evidence and what conclusions can be

10 drawn from such evidence. Thus, habeas relief is not warranted on Claim Two.

11 **C.    CLAIM THREE DOES NOT WARRANT HABEAS RELIEF**

12      **1.    Background**

13      In Claim Three, Petitioner argues the trial court's admission of evidence of

14 incidents involving Petitioner's alleged angry or violent behavior toward family

15 members violated Petitioner's due process right to a fair trial.[12] Pet. at 41.

16 Specifically, Petitioner objects to admission of testimony regarding the following

17 prior uncharged misconduct: (a) lifting Petitioner's six-month-old son off the

18 ground by his arm because he was crying, RT 69; (b) slapping his two or three year

19 old son in the head for pulling a little girl's hair, RT 70; (c) chasing his former wife

20 with a hammer when he thought she was cheating on him, RT 71-72; (d) spanking

21

22

---

23 [12]    Respondent argues Claim Three is barred by the anti-retroactivity doctrine

24 of Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). However, "circuit court holdings suffice to create a 'clearly established' rule of law under Teague." Belmontes v. Woodford, 350 F.3d 861, 884 (9th Cir. 2003) cert.

25 granted, judgment vacated on other grounds sub nom. Brown v. Belmontes, 544 U.S. 945, 125 S. Ct. 1697, 161 L. Ed. 2d 518 (2005) (citing Bell v. Hill, 190 F.3d

26 1089, 1091 (9th Cir. 1999)). In this circuit, it was well-established at the time that Petitioner's conviction became final that admission of propensity evidence under

27 certain circumstances in a trial may violate due process when there are no permissible inferences the jury may draw from the evidence. See, e.g., Jammal v.

28 Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995). Accordingly, the evidentiary error claim is not Teague-barred.

1 his four or five year old sons with a belt, RT 41; and (e) throwing food at Rebecca in
2 anger, RT 38.  See Pet. at 43-46.

3       **2.    State Court Opinion**

4       The California Court of Appeal denied Petitioner's claim relying on People
5 v. Evers, 10 Cal. App. 4th 588, 12 Cal. Rptr. 2d 637 (1992) to conclude that "the
6 trial court did not abuse its discretion by admitting the disputed evidence because it
7 was relevant to prove Vanek's intent and the absence of mistake or accident."
8 Lodg. 6 at 9.  In Evers, the defendant was convicted of second degree murder and
9 felony child abuse arising out of the death of his two-year-old stepson.  Evers, 10
10 Cal. App. 4th at 592.  The trial court had admitted evidence of the defendant's
11 prior felony conviction for severely burning the child's feet, as well as evidence the
12 defendant had previously inflicted such severe injuries on his own one-year-old
13 daughter that she was rendered a quadriplegic.  Id. at 594.  The Court of Appeal
14 found the evidence was probative of defendant's "awareness that serious injury or
15 death could result from physical abuse, such as shaking a very young child" and
16 was admissible to establish the victim's injuries did not arise from accidental
17 means.  Id. at 598-99.

18       Here, the California Court of Appeal concluded "the trial court did not
19 abuse its discretion by admitting evidence showing Vanek had an extremely short
20 temper and tended to act very violently toward the women and children in his life."
21 Lodg. 6 at 13.  The court found "[t]his evidence was relevant to prove the intent
22 element of felony child abuse and to counter Vanek's defense at trial that Gabriel's
23 injuries could have resulted from an accident, rather than from intentionally
24 inflicted child abuse."  Id.

25       **3.    Applicable Law**

26       State court evidentiary rulings cannot serve as a basis for habeas relief unless
27 the asserted error rises to the level of a federal constitutional violation.  See Estelle
28 v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).  "The

admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks and citation omitted). "Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice" has the Supreme Court "imposed a constraint tied to the Due Process Clause." Perry v. New Hampshire, ___ U.S. ___, 132 S. Ct. 716, 723, 181 L. Ed. 2d 694 (2012) (internal quotation marks and citation omitted). "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process" and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley, 568 F.3d at 1101.

A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must be of such quality as necessarily prevents a fair trial." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) (internal quotation marks and citation omitted) (emphasis in original).

Moreover, even assuming habeas relief is available for evidentiary error, a petitioner must demonstrate prejudice; that is, that the error had "'a substantial and injurious effect' on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

### 4.   Analysis

First, to the extent Petitioner's claim relies on state law only, it does not present a cognizable claim for federal habeas corpus relief. Estelle, 502 U.S. at 67-68.

Second, to the extent Petitioner claims a violation of due process, he can demonstrate error only if there are no permissible inferences from the prior bad acts evidence.  While not analyzing each prior bad act to determine whether there was a permissible inference, the Court of Appeal concluded evidence of prior bad acts was admissible to demonstrate intent and lack of mistake.  Lodg. 5 at 4-7.  Here, Petitioner's charged conduct alleged the violent shaking a two-month-old baby.  This Court finds the acts involving adult women, young children, and toddlers dissimilar from the alleged offense involving a two-month-old baby.  Hence, the Court questions whether permissible inferences can be draw from any of the prior bad acts, except possibly the incident involving Petitioner's six-month-old son.  Despite this questioning, however, the Court finds "fairminded jurists could disagree" on the correctness of the evidentiary ruling.  <u>Richter</u>, 562 U.S. at 101.  Hence, Petitioner has not met his "heavy burden" of establishing a violation of due process upon habeas review.  <u>See</u> <u>Jammal</u>, 926 F.2d at 920; <u>Boyde</u>, 404 F.3d at 1172.

Moreover, even assuming evidentiary error, Petitioner has not satisfied the heavy burden of establishing he was prejudiced by the allegedly erroneous admission of evidence.  <u>Dillard</u>, 244 F.3d at 767 n.7.  In determining Petitioner's guilt, the trial court focused on the lack of evidence contradicting Dr. Murray's expert medical opinion that (1) SBS was the cause of Gabriel's injuries, and (2) Petitioner, as the last adult to be alone with Gabriel, was the only person who could have inflicted Gabriel's injuries.  RT 655-56.  In light of this conclusive and uncontested evidence, the allegedly erroneously admitted evidence could not have had a substantial or injurious effect on the verdict.  <u>Brecht</u>, 507 U.S. at 623.

Hence, the state courts' denial of Petitioner's evidentiary error claim was not contrary to, or an unreasonable application of, federal law.  <u>See</u> 28 U.S.C. § 2254(d).  Thus, habeas relief is not warranted on Claim Three.

///

## D.     CLAIM FOUR DOES NOT WARRANT HABEAS RELIEF

### 1.     Petitioner's Claim

In Claim Four, Petitioner argues the cumulative effect of the errors alleged in Claims One, Two, and Three rendered his trial fundamentally unfair.  Pet. at 71-75.

### 2.     Applicable Law

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002, as amended June 11, 2002) (quoting United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996)) (internal quotation marks omitted). However, where no error lies with each alleged claim taken separately, there also rests no cumulative error.  See Mancuso, 292 F.3d at 957 ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation.").  Similarly, where no prejudice lies with each alleged claim taken separately, there is also no cumulative prejudice.  Thompson v. Calderon, 109 F.3d 1358, 1369 (9th Cir. 1997, as amended Mar. 6, 1997), rev'd on other grounds, 523 U.S. 538, 566, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998) ("Finding no prejudice from the errors taken separately, we also find no cumulative prejudice."); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (same).

### 3.     Analysis

Here, to the extent the Court grants the Petition and finds Petitioner's trial counsel's ineffective assistance was sufficiently prejudicial on its own to grant the Petition, Claim Four is moot.  See Alcala v. Woodford, 334 F.3d 862, 894-95 (9th Cir. 2003) (affirming habeas grant finding counsel's deficient performance was sufficiently prejudicial on its own to grant the petition).

However, if this Court denies Petitioner's ineffective assistance of counsel claim, none of the errors alleged in Claims Two, Three, or Four individually constituted error.  Accordingly, the Court finds Petitioner did not suffer any

cumulative error that deprived him of due process.  Thus, Petitioner is not entitled to federal habeas corpus relief on Claim Four.

## VII.

## **RECOMMENDATION**

IT IS THEREFORE RECOMMENDED that the District Court issue an order: (1) accepting the findings and recommendations in this Final Report; (2) directing that judgment be entered GRANTING the Petition on the basis of Claim One, and (3) VACATING the judgment of conviction in the matter of <u>People v. Samuel Vanek</u>, Case No. VA108590 of the California Superior Court of Los Angeles County.

Dated: July 26, 2016

HONORABLE KENLY KIYA KATO
United States Magistrate Judge